**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

KAREN BROWN,

                          Plaintiff,

      -against-                                    No. 15 CV 4091 (PKC)

CITY OF NEW YORK, *et al.*

                         Defendants.

-------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SANCTIONS FOR THE DEFENDANT CITY OF NEW YORK'S UNJUSTIFIED
FAILURE TO PRESERVE AND TIMELY PRODUCE RELEVANT EVIDENCE**

LEVENTHAL LAW GROUP
45 Main Street, Suite 528
Brooklyn, New York 11201
(718) 556-9600

BERNSTEIN CLARKE & MOSKOVITZ PLLC
11 Park Place, Suite 914
New York, New York 10007
(212) 321-0087

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT .......................................................................1

BACKGROUND ...............................................................................................3

LEGAL STANDARD........................................................................................9

    A.    Discovery Violations ............................................................9

    B.    Spoliation ............................................................................11

ARGUMENT ....................................................................................................

    POINT I –    THE CITY'S DISCOVERY FAILURES WERE NOT
                JUSTIFIED, THEY WERE THE PRODUCT OF
                RECKLESS DISCOVERY PRACTICES, AND THE
                CITY'S FAILURES HAVE SUBSTANTIALLY
                PREJUDICED THE PLAINTIFF ..............................................12

            A.    The City failed to comply with Fed. R. Civ. P. 26 ........................12

            B.    There is no justification for the City's failure to
                comply with Rule 26 ....................................................................13

            C.    The City's failure to comply with Rule 26 was not
                harmless, it substantially prejudiced plaintiff ...............................14

             D.    The City's explanation for its discovery failure
                reveals deeply flawed and reckless discovery
                practices .......................................................................................15

    POINT II –    THE CITY'S RECKLESS FAILURE TO PRESERVE
                EVIDENCE CAUSED THE SPOLIATION OF
                DET. FERNANDEZ'S HANDWRITTEN NOTES .................................17

            A.    The notes were relevant ................................................................18

             B.    The City had notice that litigation was foreseeable ......................18

             C.    The City acted unreasonably and with a culpable
                state of mind by taking no steps to preserve
                Det. Fernandez's notes .................................................................20

**TABLE OF CONTENTS (cont'd)**

Page

POINT III –   SEVERE SANCTIONS ARE WARRANTED SINCE THE
CITY'S DISCOVERY FAILURES WERE NOT
JUSTIFIED AND PREJUDICED THE PLAINTIFF, AND
THE CITY'S EXPLANATION REVEALS A RECKLESS
DISREGARD FOR ITS DISCOVERY OBLIGATIONS ........................20

    A.    The Court should instruct the jury of the City's
failure to timely disclose the audio recording of the
police radio transmissions ................................................................22

    B.    The Court should admit into evidence Captain
Velez's note from the day of the incident stating,
"[Mr. Williams] never had a pulse." ...............................................23

    C.    The Court should order the City to pay the reasonable
expenses and attorney's fees caused by the City's
discovery violations ........................................................................24

CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Aboeid v. Saudi Arabian Airlines Corp.*, No. 10 CV 2518 (SJ) (VVP),
   2011 U.S. Dist. LEXIS 128179 (E.D.N.Y. Sep. 6, 2011)...............................................9, 13

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2d Cir. 2001)......................................11

*Cody v. Phil's Towing Co.*, 247 F. Supp. 2d 688 (W.D. Pa. 2002) ........................................ 14-15

*Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006)...................................................10, 15

*Field Day, LLC v. Cty. of Suffolk*, No. 04-cv-2202, 2010 U.S. Dist. LEXIS
   28476 (E.D.N.Y. Mar. 25, 2010).....................................................................................18

*Gilchrist v. City of N.Y.*, 104 A.D.3d 425 (1st Dep't 2013)........................................................18

*Int'l Mining Co. v. Allen & Co., Inc.*, 567 F. Supp. 777 (S.D.N.Y. 1983) ...................................15

*Jockey Int'l, Inc. v. M/V "Leverkusen Express"*, 217 F. Supp. 2d 447
   (S.D.N.Y. 2002)..............................................................................................................9, 10

*Leidig v. Buzzfeed, Inc.*, No. 16 Civ. 542 (VM) (GWG), 2017 U.S. Dist.
   LEXIS 208756 (S.D.N.Y. Dec. 19, 2017) ..........................................................................20

*Martinez v. City of New York*, 2018 U.S. Dist. LEXIS 13409 (Jan. 24, 2018),
   *adopted in part*, 2018 U.S. Dist. LEXIS 66106 (E.D.N.Y. Apr. 18,
   2018) .............................................................................................................................21

*Nat'l Communs. Ass'n v. AT&T*, No. 92 Civ. 1735 (LAP), 1998 U.S. Dist.
   LEXIS 3198 (S.D.N.Y.  Mar. 16, 1998)..........................................................................24, 25

*Norden v. Samper*, 544 F. Supp. 2d 43 (D.D.C. 2008).................................................................13

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.,
   LLC*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010) ...................................................................16, 17

*Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*,
   280 F.R.D. 147 (S.D.N.Y. 2012) .....................................................................................9, 10

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592
   (4th Cir. 2003)..................................................................................................................22

*Seena Int'l, Inc. v. One Step Up, LTD.*, No. 15-CV-01095 (PKC) (BCM),
   2016 U.S. Dist. LEXIS 64850 (S.D.N.Y. May 11, 2016)...................................................25

*Smith v. City of New York*, 388 F. Supp. 2d 179 (S.D.N.Y. 2005) ................................................11

## TABLE OF AUTHORITIES (cont'd)

**CASES**                                                                         **PAGE(S)**

*Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522 (2d Cir. 1990).........................................25

*Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68 (S.D.N.Y.1991) ...................................11, 20

*Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67 (2d Cir. 1988).....................................21, 22

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)...............................................20

## STATUTES AND RULES

Fed. R. Civ. P. 37 .................................................................................................. 9, 10-11, 22, 24

## TREATISE

7 *Moore's Federal Practice - Civil* § 37.62 (2019) ...................................................................9, 13

## PRELIMINARY STATEMENT

For more than three years of litigation, the City of New York failed to produce *three* files from three different NYPD units that investigated Barrington Williams' death in police custody. These files contained critical evidence, including a copy of the officers' radio communications from the scene of Mr. Williams' arrest. That recording confirms the defendant officers knew that Mr. Williams was in medical distress immediately after they handcuffed him, in contradiction to their deposition testimony. The undisclosed investigation files also identified new investigating officers and a contemporaneous statement of an EMT who treated Mr. Williams that Mr. Williams "<u>never</u> had a pulse" (emphasis in original). This critical statement refutes the defendants' argument that that Mr. Williams had a pulse so there was no need for them to provide CPR or use an AED on Mr. Williams.

The City has not tried to justify its discovery failures. Nor could it when this evidence was readily available and the City strenuously resisted plaintiff's efforts to uncover it. The City disclosed these investigation files, and the fortuitous copy of the radio recording, only after the Court ordered the City to explain by affidavit why it had destroyed the recording of the officers' radio communications. Even then, the City refused further discovery necessitated by these late disclosures, which the Court eventually ordered. The City also refused to explain why it had not produced these files years earlier, which was necessary for this motion, and the Court again ordered explanatory affidavits (and later ordered the City to supplement these affidavits).

The City's affidavits reveal that it recklessly disregarded – here and apparently in § 1983 cases more generally – its obligation to preserve and produce discoverable evidence. The City did not issue a litigation hold to preserve patently relevant evidence in this case, and it appears from the record that the City does not issue litigation holds in § 1983 litigations generally. Nor did the

NYPD, in accordance with the City's discovery practices, search its own files for relevant evidence (until after the Court intervened). Instead, the City relied on its Law Department to make specific requests for evidence to the NYPD, which the NYPD, without analysis or scrutiny, mechanically fulfilled. The NYPD did not scrutinize those requests or analyze its own records to locate evidence that the Law Department has overlooked.

To find the investigation files that were turned over three years late in this case required only a rudimentary search of the NYPD's files. At least one of the undisclosed files was maintained electronically in a database that could have been searched at any point during years of discovery. The City attempts to foist the blame on the Law Department for having never requested these files, but that only obscures the root cause of the City's discovery failures: that the City's discovery practices are deliberately indifferent to the obligation to preserve and produce relevant evidence in the City's possession. The City cannot, and has not attempted to, justify its discovery failures. In fact, the City fought to withhold the circumstances of its unjustifiable discovery failures to avoid disclosure of its reckless preservation policies and systems, or lack thereof.

The City's belated disclosures substantially prejudiced the plaintiff. She conducted years of discovery and numerous depositions without critical evidence, incurred significant attorney's fees and costs forcing the City to disclose this important evidence, and she has endured many more months of delays from the City's actions. She has also been deprived of important testimony due to the passage of time and faded memories, and contemporaneous investigation notes have now been lost, which the City failed to take any steps to preserve.

A range of sanctions are appropriate and necessary to ensure that the plaintiff does not suffer prejudice and that the City does not benefit from its discovery violations and spoliation of evidence, and deter similar failures in other § 1983 cases involving the City of New York.

**BACKGROUND**

Plaintiff Karen Brown's 25-year-old son, Barrington "BJ" Williams, died in police custody on September 17, 2013, after NYPD officers arrested him inside the Yankee Stadium subway station for selling a MetroCard swipe.  Immediately after he was handcuffed, he suffered an asthma attack, respiratory arrest, and a cardiac arrest.  The officers who arrested Mr. Williams had been instructed that they had a duty to provide reasonable medical care to people in their custody and they were trained extensively by the NYPD in life-saving first aid, including monitoring vital signs, performing CPR, and using AEDs (automated external defibrillators).  Even though they knew Mr. Williams was in severe distress and needed urgent aid as quickly as possible, the officers did not provide the aid they were trained to provide.  They failed to follow their training to constantly monitor Mr. Williams' vital signs and did not perform CPR, use an AED, nor undertake any other form of first-aid.  Instead, they radioed for an ambulance and stood idly by for more than ten minutes while Mr. Williams died at their feet handcuffed behind his back.

The NYPD's investigation regarding Mr. Williams' death began immediately and involved investigators from several different NYPD units.  Decl. of Jason Leventhal, dated June 13, 2019 ("Pl.'s Decl.") at ¶ 5.[1]  Investigators from the Internal Affairs Bureau, the Transit Bureau Investigation Unit (TBIU), the 44th Precinct Detective Squad, and the Crime Scene Unit responded to the subway station to collect evidence and interview witnesses.  *Id.*  They took statements from the officers who arrested Mr. Williams and who responded after Mr. Williams was under arrest.  *Id.* ¶¶ 6-9.  They also interviewed EMTs who tried to resuscitate Mr. Williams, as well as a subway token booth clerk, and doctors at the hospital where Mr. Williams was declared dead.  *Id.* ¶ 9.  They collected a copy of the subway surveillance video that showed the officers arrest

---

[1] All exhibits cited herein are annexed to the accompanying declaration of Mr. Leventhal.

Mr. Williams and hold him in custody waiting for an ambulance to arrive.  NYPD investigators also obtained a copy of the audio recording of the officers' radio communications after Mr. Williams was arrested, which confirmed that the officers knew Mr. Williams was in severe distress and urgently needed life-saving aid.  *Id.* ¶¶ 7-8.  An "unusual occurrence report" (also known as a "UF-49") was prepared that same day, and IAB was assigned to complete the investigation.  *Id.* ¶ 11.

Two months after Mr. Williams' death, plaintiff served a notice of claim on the City of New York (through the City Law Department).  *Id.* ¶ 12.  After receiving that notice, the City did nothing to preserve the radio transmissions or the detectives' handwritten notes.  *Id.* ¶¶ 14, 51-54.  The City did not instruct the NYPD to make a copy of the officers' radio communications, despite the City's policy of deleting such recordings after 180 days, nor was the 44th Precinct Detective Squad instructed to preserve handwritten investigation notes.  *Id.* ¶ 14, 51-54.

After Ms. Brown filed this lawsuit in 2015, the City did not issue a litigation hold to preserve the radio transmissions or the detectives' handwritten notes.  *Id.* ¶ 14, 51-54.  Nor did the NYPD identify the location and custodians of potentially relevant evidence.  *Id.* ¶ 52; *see* Exs. 28-29, 32-33.  Instead, to discharge its discovery obligations, the City relied exclusively on its Law Department to submit specific requests to the NYPD for records, which the NYPD fulfilled without analysis or scrutiny.  *See* Exs. 28-29, 32-33.  To that end, the Law Department requested the IAB file because it believed "*the vast majority* of documents relevant to this matter" would be in that file.  Ex. 28 ¶ 3 (emphasis added).  The Law Department also requested "various NYPD documents including the 'Detective Case File.'"  Ex. 33 ¶ 15.[2]  In July 2015, the Law Department requested

---

[2] The fact that the Law Department had requested the "Detective Case File" in June 2015 was only revealed after the Court ordered the City to supplement its affidavits explaining its discovery violations.  In opposing plaintiff's request for supplemental affidavits, the City had asserted that "the Law Department requested the electronically maintained DD-5s from the 44th Precinct, not the entire 44th Precinct Detective Squad file, as plaintiff leads the Court

additional "documents typically prepared and maintained by the NYPD where there is an interaction between members of the service and the public." *Id.* ¶ 4.

With the exception of the Detective Squad file, the NYPD provided the requested documents to the Law Department, but it did not conduct a separate search of its files, nor did it review or analyze the lawsuit or its records to identify other potentially relevant evidence. As far as the Detective Squad file, the request apparently identified the 42nd instead of the 44th Precinct Detective Squad, and because the NYPD conducted no analysis of the Law Department's requests, it mechanically requested the 42nd Precinct Detective Squad file on Mr. Williams' death, "which necessarily yielded no responsive information." *Id.* ¶ 17. Later, the Law Department requested the 44th Precinct "Complaint Follow-up Reports," known as "DD-5s" in NYPD parlance. *Id.* ¶¶ 18-19. Specifically, the Law Department requested "the electronically maintained DD-5s." Ex. 34 at 3-4 n.3. The NYPD never obtained nor provided those documents. Ex. 28 ¶ 25; Ex. 33 ¶ 19. The City has no justification for why those documents were not produced.

The Law Department never requested the other investigation files – the Transit Bureau Investigation Unit (TBIU) and Crime Scene Unit (CSU) files. Ex. 28 ¶ 24. The Senior Counsel in the Law Department assigned to this case had reviewed the NYPD's Unusual Occurrence Report regarding Mr. Williams' death, which referred to the TBIU and CSU. *Id.* But "it was not readily apparent" to the attorney that either unit maintained a file and therefore, the Law Department did not request those records. *Id.* As noted above, the Law Department *had* requested the Detective Squad file, but the City has no justification for its failure to produce that file.

---

to believe." Ex. 34 (ECF Doc. 223) at 3-4 n.3. That misleading assertion, which apparently refers to the Law Department's later request for DD-5s, is flatly contradicted by the City's supplemental affidavits, which confirm that the Law Department requested the full Detective Squad file. Thus, the complete story revealed in the City's affidavits does not support the City's argument that its discovery violations were the product solely of attorney neglect.

The City's initial disclosures, served in October 2015, did not mention the TBIU, Detective Squad, or CSU files, and did not identify Cpt. Velez, Det. Fernandez, nor a number of other officers identified in the recently produced files. *See id.* ¶ 6. Plaintiff's document demands served in June 2016 encompassed these files, as well as the recording of the officers' radio communications. *See* Pl.'s Decl. ¶ 21.[3] But the City did not produce, nor identify, these files. *Id.* ¶ 22. As is now clear from the City's affidavits, the City did not search for these records in response to plaintiff's discovery demands. *See* Exs. 28-29, 32-33. The City also failed to explain that it had destroyed the recording of the officers' radio communications more than two-and-a-half years earlier. *See* Pl.'s Decl. ¶ 22. In February 2017, plaintiff served another demand for the audio recordings. *Id.* ¶ 23. The City again failed to disclose that it had destroyed the recording and stated that it would "determine whether any audio recordings of the radio runs related to the Incident exist." *Id.*

In October 2018, less than a week before plaintiff's deadline to move for summary judgment, the City acknowledged that it had destroyed the audio recording. *Id.* ¶ 26. Plaintiff asked the City to explain the circumstances of the destroyed recording – given that plaintiff's notice of claim was served months before the City's standard retention policy would have permitted the recording to be destroyed. *Id.* ¶¶ 27-30. Plaintiff dedicated substantial time researching and briefing the spoliation issue as it was relevant to plaintiff's motion for summary judgment. *Id.* ¶ 29. For the next two months, plaintiff pressed for an explanation, which the City said it was looking into, until December 2018, when the City stated that it would not agree to provide *any* additional discovery regarding the destruction of the radio recording. *Id.* ¶ 30. The

---

[3] Plaintiff's first set of demands requested "[a]ll documents, reports, notes, and memorandum prepared in connection with any investigation conducted by the NYPD" into the death of Mr. Williams; "[a]ll audio recordings" and "NYPD/FDNY radio transmissions and records . . . relating to the Incident or any investigation conducted by the NYPD or any other agency of the City of New York into the circumstances surrounding the death of decedent Barrington Williams"; and all "video recordings, audio recordings, memos, e-mails, documents or otherwise which in any way relate, include or mention the Incident, decedent Barrington Williams, [and] any investigation into the incident." Ex. 14 (Demands 3, 5, and 14).

City then filed its motion for summary judgment, arguing that the officers' failure to perform any life-saving measures on Mr. Williams was reasonable because he must have had a pulse when FDNY officers arrived two minutes before EMTs arrived.  *Id.* ¶ 31.

Plaintiff moved for a discovery conference regarding the destruction of the recording of the officers' radio transmissions, and on December 20, 2018, the Court ordered the City to produce an affidavit explaining the circumstances of the destruction of the recording.  *Id.* ¶¶ 31-33.  The following month, the City suddenly produced the TBIU file, which happened to contain a copy of the recording, *id.* ¶ 34; and the City asserted that its failure to preserve the original recording after it knew litigation was foreseeable was a "moot" issue, ECF Doc. 193.  In addition to the audio recording, the TBIU file contained important new evidence, including a handwritten note from a TBIU investigator that "EMS . . . state [Mr. Williams] never had a pulse."  *See* Pl.'s Decl. ¶ 35.

Plaintiff asked the City to produce additional discovery arising from this newly-produced evidence, but the City refused.  *Id.* ¶ 36.  Specifically, plaintiff asked for continued depositions of the defendant officers who made the radio transmissions and a deposition of the TBIU investigator whose handwritten notes were in the file.  *Id.*  The City refused based on inaccurate assertions about the late discovery.  *Id.* ¶¶ 37-38.  Plaintiff requested a discovery conference, and the night before the conference on plaintiff's application for additional discovery, the City produced, for the first time, the 44th Precinct Detective Squad file.  *Id.* ¶¶ 39-40.  That file contained the identities of dozens of previously-undisclosed officers and detectives who participated in the investigation of Mr. Williams' death and memos of witness interviews.  *Id.* ¶ 40.

At the January 31, 2019, discovery conference, the City withdrew its objection and consented to additional discovery.  *Id.* ¶ 41.  The Court set a 45-day period for the parties to complete "discovery related to the newly produced materials."  *Id.*

Shortly thereafter, the City said it would not respond to Plaintiff's demands related to the newly disclosed evidence and plaintiff was forced to move for a discovery conference seeking responses. *Id.* ¶¶ 42-43.  Days before that conference, the City produced a third previously undisclosed file from the NYPD's Crime Scene Unit. *Id.* ¶¶ 44-45.  That file included photographs and detailed diagrams of the subway station and location of Mr. Williams' death. *Id.* ¶ 45.

Judge Castel held a discovery conference in March 2019 and, after hearing the parties' initial arguments, the Court denied the parties summary judgment motions without prejudice and referred the case to Magistrate Judge Gorenstein to preside over discovery. *Id.* ¶ 46.

Without any reasonable basis, the City continued to refuse to produce any discovery of the circumstances that resulted in its failure to timely disclose and preserve evidence, and therefore, plaintiff requested yet another discovery conference. *Id.* ¶¶ 47-49.  Again, the Court ordered the City to produce additional discovery, *viz.*, affidavits explaining how the NYPD failed to produce the recently produced evidence. *Id.* ¶ 50.  Because those affidavits were inadequate, and the City refused to provide any additional information, plaintiff sought yet another discovery conference. *Id.* ¶¶ 52-53.

On April 29, 2019, the Court held yet another discovery conference.  The Court first ordered that the City's explanation for its discovery failures contained in its affidavits "is everything" and the City would "be precluded from offering new evidence on that topic." *Id.* ¶ 54. In particular, the Court instructed that the City could not come forward with a new claim that it "had a litigation hold of some particular kind." *Id.*  The City conceded that "[a]s to the matters described in the affidavits . . . these are the collection efforts that were made with respect to" the newly-produced documents. *Id.*  The Court then ordered the City to provide additional affidavits explaining whether it had issued a litigation hold that covered the lost detective's notes and, if

possible, explaining why the NYPD had not provided the Law Department with the requested documents from the Detective Squad. *Id.* ¶ 55.

The City thereafter produced additional affidavits acknowledging "there was no litigation hold issued in this matter that would have specifically encompassed Detective Javier Fernandez's notes" and "in the context of 42 U.S.C. § 1983 litigations, generally, preservation of NYPD detectives' handwritten notes is achieved through the collection of those documents by the Law Dept., rather than via the issuance of a litigation hold." *See id.* ¶ 56. The City conceded its practice was only "typically sufficient to avoid spoliation." The City offered no justification for why the NYPD had not provided the Law Department with requested documents. *Id.* ¶ 57.

## LEGAL STANDARD

### A.      Discovery violations

Federal Rule of Civil Procedure 37(c)(1) permits sanctions when "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), . . . unless the failure was substantially justified or is harmless." "The party that fails to comply with Rule 26(a) or (e) bears the burden of proving both that its non-compliance was substantially justified and that it was harmless." *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) (citations omitted); *accord Aboeid v. Saudi Arabian Airlines Corp.*, No. 10 CV 2518 (SJ) (VVP), 2011 U.S. Dist. LEXIS 128179, at *5-7 (E.D.N.Y. Sep. 6, 2011).

"'Substantial justification' may be demonstrated where there is justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request," *Jockey Int'l, Inc. v. M/V "Leverkusen Express"*, 217 F. Supp. 2d 447, 452 (S.D.N.Y. 2002) (quotation marks omitted), "or if there exists a genuine dispute concerning compliance," 7 *Moore's Federal Practice - Civil* § 37.62 (2019).

"Harmless" under Rule 37(c) "means an absence of prejudice to the defendant." *Ritchie Risk-Linked Strategies*, 280 F.R.D. at 159; *Jockey Int'l*, 217 F. Supp. 2d at 452 ("Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure." (quotation marks omitted)).  The relevant examples of "harmless" discovery failures in the Advisory Committee's notes are limited to where the undisclosed information was known to the other party.  Fed. R. Civ. P. 37(c) advisory committee's note (1993) ("the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party").

"A district court has wide discretion to impose sanctions, including severe sanctions" under Rule 37(c).  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).  This discretion should be guided by: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.* (citation and internal quotation marks omitted).  A showing of bad faith is not required for a court to issue sanctions under Rule 37(c), nonetheless, "it can be taken into account as part of the party's explanation for its failure to comply. *Id.*

The primary sanction provided by Rule 37(c) is to not allow the party that failed to disclose information or a witness "to use that information or witness to supply evidence on a motion, at a hearing, or at a trial."  Since that sanction is ineffective when the undisclosed information or witness is not helpful to the party that failed to make disclosure, Rule 37(c) also provides that:

> In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
>> (A)    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B)  may inform the jury of the party's failure; and

(C)  may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

The sanctions provided in Rule 37(b)(2)(A) include: "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims," and "(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."

### B.  Spoliation

"A party to litigation has an obligation to retain evidence that it knows, or should know, may be relevant to actual or foreseeable litigation."  *Smith v. City of New York*, 388 F. Supp. 2d 179, 189 (S.D.N.Y. 2005); *see also Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y.1991) ("the obligation to preserve evidence even arises prior to the filing of a complaint where a party is on notice that litigation is likely to be commenced").

"Courts have authority to sanction the loss or destruction of evidence pursuant to Rule 37(b) and their inherent power." *Smith*, 388 F. Supp. 2d at 188-89 (citing *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)).  "For sanctions to be imposed, a party must establish that: (1) the party with control over the evidence had a duty to preserve it when it was lost or destroyed; (2) the evidence was lost or destroyed with a 'culpable state of mind'; and (3) the evidence was relevant.  *Id.* at 189 (citing *Res. Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).  "Sanctions may be imposed for both intentional and negligent destruction of evidence." *Id.*

"The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'" *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *Kronisch v. United*

11

*States*, 150 F.3d 112, 126 (2d Cir. 1998)).  "This sanction serves a threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation."  *Id.*

**ARGUMENT**

**POINT I**

**THE CITY'S DISCOVERY FAILURES WERE NOT JUSTIFIED, THEY WERE THE PRODUCT OF RECKLESS DISCOVERY PRACTICES, AND THE CITY'S FAILURES HAVE SUBSTANTIALLY PREJUDICED THE PLAINTIFF**

Sanctions are required here because (A) the City failed to comply with Rule 26 by not timely disclosing critical evidence, including evidence plaintiff had requested, (B) the City's failure was not justified, (C) plaintiff was prejudiced by the City's failure, and (D) the City's explanation shows the City acted with reckless disregard to its discovery obligations.

**A.      The City failed to comply with Fed. R. Civ. P. 26.**

The City's failure to timely identify and produce the TBIU, Detective Squad, and CSU files in 2015, or at least by 2016, violated Fed. R. Civ. P. 26.  The City did not disclose these files in its October 2015 initial disclosures, which violated Rule 26(a).  The City's failure to later supplement its disclosures violated Rule 26(e).  These files were covered by plaintiff's first set of document demands served in June 2016.  There can be no reasonable dispute that the TBIU, Detective Squad, and CSU files, and the evidence kept in those files, should have been produced by at least October 21, 2016, when Defendants responded to Plaintiff's first set of discovery demands.  Accordingly, the City failed to comply with Rule 26, and it has never suggested otherwise.

12

**B.**      **There is no justification for the City's failure to comply with Rule 26.**

The City must concede that its failure to comply with Rule 26 was not justified since it took no steps to locate and produce the TBIU and CSU files and has not explained why the Detective Squad file was never produced even though the Law Department requested it.  But in the event that the City argues that its failure was not merely justified, but *substantially justified*, the City bears the burden to establish that defense.  *See Aboeid*, 2011 U.S. Dist. LEXIS 128179, at *5-7 (the dilatory party "bears the burden of demonstrating substantial justification").

There is no justifiable reason this evidence was not produced three years ago.  The City knew that TBIU, the Detective Squad, and CSU were all involved in the investigation of Mr. Williams' death, yet the City simply never produced those files during discovery even though plaintiff specifically demanded any such records.  The City's lawyers had specifically requested the Detective Squad file and the DD-5s from the NYPD in June and July 2015.  Moreover, the City has acknowledged that the DD-5s were stored electronically in July 2015, *see* Ex. 34 at 3-4 n.3, and the Detective Squad and CSU files that have since been produced were maintained in electronic databases, *see* Ex. 6 at 12:2-23 (Det. Fernandez testified that he accessed the Detective Squad file on his computer by merely entering the case number).

These filed could have been easily located at any point, but the City simply never looked for them. As such, the City cannot demonstrate a substantial justification for failing to timely disclose these files.  *See Moore's Federal Practice* § 37.62 ("Another factor that courts may consider in determining whether a party's failure to comply with Rule 26(a) or 26(e) was substantially justified is the quality of the investigation or search that preceded the disclosure."); *see also Norden v. Samper*, 544 F. Supp. 2d 43, 50 (D.D.C. 2008) ("[s]loppy responses to the opposing party's discovery do not constitute substantial justification").

13

C.   **The City's failure to comply with Rule 26 was not harmless, it substantially prejudiced plaintiff.**

The City cannot meet its burden to show that its discovery failures were harmless.  Plaintiff has been substantially prejudiced by these failures.

First, important evidence has now been lost (*see* Point II *infra)* and memories have faded because of the City's discovery delay.  Significantly, TBIU Captain Rosendo Velez's testified that he no longer recalls the identity of the NYPD investigator who told Velez that an EMT said "[Mr. Williams] never had a pulse."  *See* Ex. 1 at 28:2-14.  As the City failed to disclose this important statement for more than three years, plaintiff cannot determine the identity of the investigator who took that statement from the EMT.  The fact that Cpt. Velez testified that it was an NYPD investigator who conveyed that EMT statement to Cpt. Velez should mean the EMT's statement is admissible as an opposing party's statement under Fed. R. Evid. 801(d)(2)(D).

In addition, Det. Javier Fernandez, also identified years after the City had an obligation to disclose his involvement in this case, documented his interview of an EMT shortly after Mr. Williams died.  Det. Fernandez testified recently that he had no recollection of his involvement in this case nor his interview with the EMT, and that he took handwritten notes during that interview but could not locate his notes.   Det. Fernandez searched for his notes, for the first time, a few weeks before his deposition but could not find them.   *See* Point II *infra.*   Thus, Det. Fernandez's memory has faded and his notes lost as a result of the City's discovery failures.

Next, Plaintiff was forced to seek additional discovery and due to the City's recalcitrance, move to compel no less than *five* times, *see* Exs. 17, 20, 23, 24, 30; *see also* Ex. 26, resulting in as many orders directing the City to provide additional discovery.  Plaintiff had to re-depose one of the defendant officers, and take depositions of two non-party witnesses well after other discovery was completed.  This was all of significant prejudice to plaintiff.  *See*, *e.g.*, *Cody v. Phil's Towing*

*Co.*, 247 F. Supp. 2d 688, 696 (W.D. Pa. 2002) (finding prejudice where late disclosures required the plaintiff to re-depose a witness and conduct further discovery; "Plaintiff was entitled to explore these areas during the initial period of discovery and was deprived of an opportunity to do so.").

Third the City's conduct has caused substantial delay. Discovery closed last year, and summary judgment motions were scheduled to be completed by February 2019. *See* ECF Doc. 179. Those motions were initially denied with leave to represent after necessary additional discovery was completed. Summary judgment motions are now scheduled to be completed in August 2019. *See* ECF Doc. 233. Therefore, this case has been delayed an additional six months due to the City's conduct.

Finally, plaintiff was forced to move for summary judgment without evidence that supports her motion (and nearly had to oppose Defendants' motion without evidence that squarely contradicts their claims). This has caused Plaintiff significant prejudice. *See*, *e.g.*, *Int'l Mining Co. v. Allen & Co., Inc.*, 567 F. Supp. 777, 789 (S.D.N.Y. 1983) (Judge Sweet found prejudice where the party had not received timely discovery "was forced to file its motion for summary judgment without the benefit of discovery that it is entitled to"). Plaintiff also expended substantial resources briefing the issue of the spoliation of the audio recording, a copy of which has since been produced.

### D.   The City's explanation for its discovery failure reveals deeply flawed and reckless discovery practices.

The City's explanation for its discovery failures, described in the City's declarations, are relevant to the appropriate sanctions. *See Design Strategy, Inc.*, 469 F.3d at 296 (a district court's "wide discretion to impose sanctions, including severe sanctions" under Rule 37(c) should be guided first by "the party's explanation for the failure").

First, the City did not issue a litigation hold and apparently does not issue litigation holds in § 1983 cases.  "[T]he first step in any discovery effort is the preservation of relevant information . . . ."  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 464-65 (S.D.N.Y. 2010).  Had the City acted to preserve relevant evidence after plaintiff's notice of claim or Complaint was served, these discovery failures should not have occurred.

Second, the City discharges its discovery obligations *not* by having the NYPD review or search its files for potentially relevant evidence, but instead, by having the NYPD mechanically respond to specific document requests submitted by the Law Department.  This flips discovery on its head, and creates a system whereby the City (a) is certain to not identify and produce all relevant discovery, and (b) shifts the blame to the Law Department for not requesting relevant documents.

It is reckless for the City to rely exclusively on employees who are not as knowledgeable about the NYPD's complex records as NYPD personnel to identify the NYPD documents that may exist and not have the NYPD perform any analysis, review, or guidance on what additional evidence may exist and who the "key players" are.  As the NYPD Executive Director of Civil Litigation has explained, the NYPD's record-keeping system is byzantine: "The Department utilizes, maintains, and stores documents through a complex mix of both electronic records and paper documents and files," and "paper records and files are maintained throughout more than 230 police facilities within the City of New York."  Ex. 29 at ¶ 5-6.  Even though the NYPD's Police Action Litigation Section is staffed by lawyers and has a Civil Litigation Unit staffed by "personnel who have experience identifying the various custodians of Department records, and who have access to an increasing variety of Department databases," *id.* ¶ 7, the City discharges its discovery obligations by relying on the Law Department attorneys, rather than NYPD personnel identify all

potentially relevant evidence. This is a reckless discovery practice. *See Pension Comm. of the Univ. of Montreal Pension Plan*, 685 F. Supp. 2d 456, 464-65 ("the failure to collect records — either paper or electronic — from key players constitutes gross negligence or willfulness").

Third, the City's discovery failures were compounded by the City's refusal to explain why it had not timely produced highly-relevant discovery, and this all occurred in the face of the Court's admonishments regarding the City's discovery misfeasance in this case and other § 1983 cases. *See* Pl.'s Decl. ¶¶ 30-61.

For these reasons, sanctions are appropriate. Before turning to the appropriate sanctions, addressed *infra* Point III, we address the other basis for sanctions, the City's spoliation of evidence.

## POINT II

### THE CITY'S RECKLESS FAILURE TO PRESERVE EVIDENCE CAUSED THE SPOLIATION OF DET. FERNANDEZ'S HANDWRITTEN NOTES

In addition to the City's failure to timely produce relevant evidence, which has prejudiced plaintiff, the City recklessly failed to preserve important evidence that has now been lost: Detective Javier Fernandez's contemporaneous notes of his interviews with an EMT who attempted to treat Mr. Williams at the scene of his arrest. Det. Fernandez was never asked to preserve nor produce his notes until 2019, when he searched for his notes and could not locate them. Ex. 5 at ¶¶ 9-10. He testified in his deposition that if he had been asked for those notes three months after he created them, he would have been able to find them then. Ex. 6 at 50:21-51:12. The City was served with a notice of claim regarding Mr. Williams' death two months after he died. Thus, the City's irresponsible discovery practices caused the spoliation of Det. Fernandez's handwritten notes.

17

### A.      The notes were relevant.

In his deposition and sworn declaration, Det. Fernandez testified that he interviewed the EMT on the day of Mr. Williams' death and took notes of that interview but could not recall specifically what notes he took other than pedigree information.  *See* Ex. 5 at ¶¶ 3-6; Ex. 6 at 49:9-15.  He testified he later prepared a report known as a "DD-5" and has "no reason to believe" that the DD-5 "would not have memorialized the content of any notes" he took.  Ex. 5 at ¶¶ 7-8.  But he had no independent memory of the events, nor could he now recall other known facts, like who the other investigating detectives were and that the Transit Bureau Investigation Unit was investigating Mr. Williams' death at the same time as Det. Fernandez.  Ex. 6 at 9:6-17, 25:14-16, 53:9-12.  His DD-5 also does not reflect what other investigating officers he conferred with, but he was confident that he would have conferred with IAB investigators.  *Id.* at 55:2-7.  Thus, we cannot know whether Det. Fernandez's lost handwritten notes (a) were fully memorialized in his DD-5, and (b) identified other investigators with whom Det. Fernandez conferred during the investigation.

### B.      The City had notice that litigation was foreseeable.

Federal judges in this circuit and New York appellate courts have concluded that a notice of claim provides notice that litigation is foreseeable and gives rise to a duty to preserve evidence related to that claim.  *See, e.g.*, *Field Day, LLC v. Cty. of Suffolk*, No. 04-cv-2202, 2010 U.S. Dist. LEXIS 28476, at *15 (E.D.N.Y. Mar. 25, 2010) ("[T]he County was put on notice of the potential for future litigation when it received Field Day's notice of claim and its duty to preserve arose on that date if not before."); *Gilchrist v. City of N.Y.*, 104 A.D.3d 425, 425-26 (1st Dep't 2013) (sanctioning the City for not preserving evidence after receiving a notice of claim and precluding the City from offering contrary testimony).

18

**C.**     **The City acted unreasonably and with a culpable state of mind by taking no steps to preserve Det. Fernandez's notes.**

The City has conceded that it did nothing to preserve Det. Fernandez's investigation notes, even after it was served a notice of claim. The City also admits that even after it was served with the Complaint in this action, it did not issue a preservation hold, nor did it take any other steps to preserve Det. Fernandez's notes.

The City's explanation for not preserving these notes evinces deliberate indifference to the preservation of this evidence. The City admits it did not undertake "any efforts to collect any notes composed by Detective Fernandez until February 2019." Ex. 32 at ¶ 4; *see also* Ex. 5 at ¶ 10. It asserts that its failure to preserve these notes "can be attributed to the fact that [Det. Fernandez] is not a defendant in this litigation and was not identifiable as a key custodian," and the City's attorney "was not in possession of any information and/or documents suggesting that Detective Fernandez would have been in possession of unique relevant documents." Ex. 32 at ¶ 4. But, of course, *the City* was in possession of information *and* documents that showed Det. Fernandez had interviewed important eye witnesses on the day of Mr. Williams' death. Ex. 32 at ¶ 20; Ex. 5 at ¶¶ 3-7. In fact, the City Law Department had requested the Detective Squad file from the NYPD in 2015, but the NYPD never provided it. Ex. 33 at ¶ 15. Thus, the City's justification for not preserving Det. Fernandez's notes is meritless.

Indeed, the City *knew* that its discovery practices could lead to the spoliation of this evidence and yet, it allowed that to happen. "[I]n the context of 42 U.S.C. § 1983 litigations, generally," the City declares, "preservation of NYPD detectives' handwritten notes is achieved through the collection of those documents by the Law Dept., rather than via the issuance of a litigation hold." Ex. 32 at ¶ 2. But the City admits that this practice will foreseeably lead to the

loss of such notes in some cases.  *See id.* ¶ 3 (the City's practice for collecting "such notes is *typically sufficient* to avoid spoliation" (emphasis added)).

The City recklessly failed to preserve Det. Fernandez's handwritten notes after it knew that litigation was foreseeable.  It knew the notes existed, it was on notice of impending litigation after it received plaintiff's notice of claim two months after Mr. Williams died, and it took no steps whatsoever to preserve Det. Fernandez's notes.

The City's failure to implement a litigation hold – either after receiving plaintiff's notice of claim or after receiving the complaint in this action – was unreasonable.  *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."); *see also Leidig v. Buzzfeed, Inc.*, No. 16 Civ. 542 (VM) (GWG), 2017 U.S. Dist. LEXIS 208756, *35-37 (S.D.N.Y. Dec. 19, 2017) (failing to implement a litigation hold meant the party had not acted reasonably in attempting to preserve the lost evidence); *Turner*, 142 F.R.D. at 73 (the obligation to preserve evidence "ran first to counsel, who had a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction," and "[s]imilarly, the defendants' corporate managers were responsible for conveying this information to the relevant employees").

Accordingly, the following sanctions are appropriate.

## POINT III

### SEVERE SANCTIONS ARE WARRANTED SINCE THE CITY'S DISCOVERY FAILURES WERE NOT JUSTIFIED AND PREJUDICED THE PLAINTIFF, AND THE CITY'S EXPLANATION REVEALS A RECKLESS DISREGARD FOR ITS DISCOVERY OBLIGATIONS

The City failed to comply with Rule 26 without justification and that failure prejudiced plaintiff.  Therefore, sanctions under Rule 37(c) are appropriate.  Taking into account the City's

explanation for its discovery failure, which reveals deeply flawed discovery practices, the City's history of similar discovery violations in other § 1983 cases, the highly probative nature of the withheld evidence, and that the defendants officers testified inconsistent with the withheld evidence before it was disclosed, severe sanctions are warranted.

The history of the City's discovery failures in other § 1983 cases, when viewed through the lens of the discovery practices described in the City's declarations in this case, appear to have been a product of the City's reckless discovery practices. This militates in favor of severe sanctions. As this Court explained in *Bah*, "a legitimate purpose of sanctions" is that "they should be hard enough to ensure that the conduct is not repeated ever again." *Bah*, transcript of Nov. 6, 2017 conf. at 301:2-25 ("this will be the last case where this takes place, because if there is a basis for sanctions, they will sting so hard that no one will do it again"); *see also See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) ("Disciplinary sanctions under Rule 37 are intended to . . . serve a general deterrent effect on the case at hand and on other litigation.").

In other § 1983 cases, the City similarly failed to produce highly-relevant evidence, refused to produce that evidence despite specific demands, and then disclosed the evidence only after a court order (or several orders) were issued. *See, e.g.*, *Martinez v. City of New York*, No. 16 CV 79 (AMD) (CLP) (E.D.N.Y. March 18, 2019) (ECF Doc. 168) (the City withheld relevant investigative files for two years of discovery and Magistrate Judge Pollak ordered the City to pay more than $140,000 in costs and fees);[4] *Bah v. City of New York*, No. 13 Civ. 6690 (PKC).

---

[4] Judge Pollak earlier issued a searing decision describing the City's misconduct and recommending that the City pay all reasonable expenses caused by its discovery failures; Judge Donnelly adopted that recommendation. *See Martinez v. City of New York*, 2018 U.S. Dist. LEXIS 13409 (Jan. 24, 2018), *adopted in part*, 2018 U.S. Dist. LEXIS 66106 (E.D.N.Y. Apr. 18, 2018). In that decision, Judge Pollak explained that "long after discovery had closed, defendants had come forward with two key witnesses and documents from multiple investigations" regarding the plaintiff's post-arrest injury. *Id.* at *50. "Despite plaintiff's herculean efforts to get to the bottom of what happened that night, no one prior to December 18, 2017 could explain how the plaintiff came to be injured or who was responsible for the injury, and defendants resisted discovery every step of the way. . . ." *Id.*

As this Court is aware, the City's conduct in *Bah* is similar to what occurred here. There, the City claimed for years that it did not have Mr. Bah's clothing, but it was later made clear that the City had not in fact searched for the clothing because the City found it during trial exactly where it was expected to be.[5] These other prominent instances of the City's discovery failures are relevant to this instant motion. *See Update Art, Inc.*, 843 F.2d at 71.

> ### A.   The Court should instruct the jury of the City's failure to timely disclose the audio recording of the police radio transmissions.

First, the Court should instruct the jury that the City failed to timely produce the police radio transmissions. *See* Fed. R. Civ. P. 37(c)(1)(B). This sanction is appropriate because the principal sanction in Rule 37(c)(1) – precluding the producing party from relying on the late-disclosed evidence – is inapposite since the withheld evidence supports the plaintiff and contradicts the City's defense. *See* Rule 37(c) advisory committee's note (1993) ("Preclusion of evidence is not an effective incentive to compel disclosure of information that, being supportive of the position of the opposing party, might advantageously be concealed by the disclosing party. However, the rule provides the court with a wide range of other sanctions . . . ."); *see also S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 n.2 (4th Cir. 2003) ("The alternative sanctions referenced in [Rule 37(c)(1)] are primarily intended to apply when a party fails to disclose evidence helpful to an *opposing* party.")

It is particularly appropriate to inform the jury of the belated disclosures because it is relevant to the officers' effort to obscure what they knew. Officer Ramos testified that he did not

---

[5] *Bah*, transcript of Nov. 6, 2017 conf. at 301:2-22 ("THE COURT: . . . there will be a thorough hearing into what caused the city attorneys to represent as they did, based on the materials before them, that the clothing had been returned to the mortuary. I heard this, this representation was repeated. And one phone call to the substitute witness, . . . one of the early questions, is it the practice to return the clothing of a decedent in a police shooting to the funeral home the mortuary home? Pathologist said absolutely not. . . . And assuming he told the truth, it is unforgivable to me that, either through malevolence or incompetence, this would not have been discovered." (paragraph breaks omitted)).

immediately put a rush on the ambulance – we now know this testimony is inconsistent with his radio communications.  The impeachment value of this testimony is amplified by the fact that when Officer Ramos gave this testimony, the City was withholding the recording that contradicted his testimony.  One would now expect Officer Ramos to testify consistently with the recording of his radio transmissions, thus, it will be important for the jury to understand the sequence of the disclosures in this case as it relates to the officer's veracity.

> **B.      The Court should admit into evidence Captain Velez's note from the day of the incident stating, "[Mr. Williams] <u>never</u> had a pulse."**

Second, the Court should order that Cpt. Velez's note, stating that "[Mr. Williams] <u>never</u> had a pulse," be admitted into evidence for the truth of the matter asserted to decide the parties' summary judgment motions and at trial, because the City's discovery violations prevented plaintiff from discovering the identity of the investigator who provided that statement to Cpt. Velez.

 A critical issue in this case is Mr. Williams' condition when EMTs arrived at the scene. Notwithstanding that the defendant officers testified that they did not know if Mr. Williams was breathing or had a pulse, and the firefighters and EMTs testified that they had no independent recollection of Mr. Williams' condition, the City has argued that "[Mr.] Williams had a pulse." *See* Defs.' Summ. J. MOL (ECF Doc. 181) at 4-6 & 21.

At his March 2019 deposition, Cpt. Velez testified that he no longer remembers the identity of the NYPD investigator who told Cpt. Velez that the EMTs stated Mr. Williams never had a pulse.  Cpt. Velez memorialized that statement in his handwritten note that "EMS then takes over (state [Mr. Williams] <u>never</u> had a pulse).  Ex. 2 (DEF 9418).  In addition, the City recently disclosed that Det. Javier Fernandez interviewed an EMT, but as a result of the City's failure to identify Det. Fernandez for more than three years, Det. Fernandez could no longer recall any of the facts of that interview and his handwritten notes could not be located.

Thus, as a result of the City's discovery violations, plaintiff has been hamstrung in her ability to identify the NYPD investigator who took the EMT's statement memorialized by Cpt. Velez.  If the City had properly discharged its discovery obligations, plaintiff likely would have identified that investigator years ago and there would be no question that the EMT's statement would be admissible as an opposing party's statement under F.R.E. 801(d)(2)(D).  Further, as all the parties involved in making and memorializing the statement are City employees acting within the scope of their employment – the EMT made the statement to the NYPD investigator who conveyed the statement to Cpt. Velez – Cpt. Velez's notes memorializing the statement bear significant indicia of trustworthiness.

Based on the City's discovery violations and the indicia of trustworthiness surrounding Cpt. Velez's note, the Court should admit Capt. Velez's note into evidence.  *See Nat'l Communs. Ass'n v. AT&T*, No. 92 Civ. 1735 (LAP), 1998 U.S. Dist. LEXIS 3198, at *33-34 (S.D.N.Y. Mar. 16, 1998) (allowing the party affected by discovery violations to introduce hearsay that bears significant indicia of trustworthiness)

### C.    The Court should order the City to pay the reasonable expenses and attorney's fees caused by the City's discovery violations.

Finally, the Court should order the City to pay "the reasonable expenses, including attorney's fees, caused by the [City's] failure" to turn over this highly-relevant discovery for more than three years.  Fed. R. Civ. P. 37(c)(1)(A).  Since the City's October 2018 admission that it destroyed the audio recording of the radio communications, plaintiff has incurred extensive attorney's fees in seeking to learn the circumstances of the destruction and additional discovery arising from the newly produced evidence.  These efforts uncovered a copy of the destroyed recording, and other substantial evidence, which the City only found and produced after plaintiff

24

moved for relief and the Court ordered the City to produce an affidavit explaining the circumstances of the destruction of the recording.

Moreover, the plaintiff incurred extensive attorney's fees researching and briefing the spoliation of the audio recording in connection with her summary judgment motion, which is no longer applicable since a copy of the recording has been uncovered. The City's reckless discovery practices caused these unnecessary expenses and the plaintiff should not bear their burden.

Therefore, the City, not the plaintiff, should bear the substantial costs that have been incurred in uncovering this important evidence, and the related work required by the City's recalcitrance in explaining its discovery failures, as well as this motion. *See, e.g.*, *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525-26 (2d Cir. 1990); *Seena Int'l, Inc. v. One Step Up, LTD.*, No. 15-CV-01095 (PKC) (BCM), 2016 U.S. Dist. LEXIS 64850 (S.D.N.Y. May 11, 2016); *Nat'l Communs. Ass'n*, 1998 U.S. Dist. LEXIS 3198, at *10 (charging the delinquent party with the cost of continued discovery necessitated by its discovery violations).

## CONCLUSION

For the foregoing reasons and based on the facts established in plaintiff's supporting declaration and accompanying exhibits, the Court should issue an order sanctioning the City for its substantial discovery violations and spoliation in this case, together with such other relief that the Court deems appropriate.

Dated: New York, New York
June 13, 2019

Respectfully submitted,

Joshua S. Moskovitz
Jason Leventhal

*Attorneys for Plaintiff*